**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     **Plaintiff,**

v.                                  **2:21-CR-1827-DHU**

SHAWN MICHAEL NORTON,

     **Defendant.**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on an *Opposed Motion to Suppress Evidence by Shawn Michael Norton*, Doc. 97. On December 8, 2021, Defendant Norton was indicted for allegedly violating 18 U.S.C. §§ 922(g)(1) and 924 by being a felon in possession of a firearm and ammunition. Doc. 1. The prosecution of Defendant is based, in part, on DNA evidence obtained through a search warrant which purportedly links Defendant to a firearm found by law enforcement officers in a purse belonging to Defendant's girlfriend. Defendant pled not guilty to the charges and now argues that the DNA evidence sought to be introduced at trial by the Government should be suppressed because it was obtained in violation of the Fourth Amendment and *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). For the reasons stated below, the Court GRANTS Defendant's motion.

### I.
### FACTS AND PROCEDURAL BACKGROUND

**A. The Incident at Byron T's Saloon and Initial Interview of Witnesses**

On October 23, 2021, Shawn Norton ("Defendant") was sitting on an outside patio of the Byron T's Saloon in Las Vegas, New Mexico, with his girlfriend Aundrea Perez, and other members of the Mongols Motorcycle Club. Doc. 97 at 1 (Def.'s Mot. to Supp.) Officers from the Las Vegas Police Department and the San Miguel County Sheriff's Department, along with

investigators from the Fourth Judicial District Attorney's Office, were also at the Byron T's Saloon to execute felony arrest warrants on two Mongols members believed to be at the Saloon.  Doc. 108 at 1 (Gov't's Resp.).[1]  After confirming that the two individuals who were the subject of the arrest warrants were present, the law enforcement officers approached the group of motorcycle club members, including Defendant and Ms. Perez, and ordered all of them to put their hands in the air and get on the ground. *See id*. at 2.  During the ensuing interaction between law enforcement officers and the group of motorcycle club members, an investigator asked Ms. Perez if she had any weapons on her and she responded that she had a gun in her purse.  Upon locating the firearm in a black purse belonging to Ms. Perez, both she and Defendant Norton were arrested and charged with unlawful carrying of a firearm in a liquor establishment in violation of New Mexico state law. Doc. 97 at 1.

While officers were still at the scene, New Mexico Highlands University Police Chief Clarence Romero ("Chief Romero" or "Romero") and his wife approached law enforcement officers and spoke to San Miguel Sheriff Deputy Jayme Vigil ("Deputy Vigil").  The discussion between Deputy Vigil and Chief Romero was captured and recorded on Deputy Vigil's body camera. Doc. 97, Ex. A.[2]  The lapel video shows that Deputy Vigil did not seek out Chief Romero, but rather Chief Romero asked to speak with her and was waiting for her and another officer to finish the interview of another individual.  *See id*. at 0:00 to 1:15. Once told that the Chief wanted to speak with her and that he was about to leave, Deputy Vigil walked over to where Romero and his wife were and followed them into a private area of the hotel where the Byron T's Saloon is located.  *See id*. at 1:20-1:40. Chief Romero began by providing information to assist officers in

---

[1] Defendant Norton was not the subject of any of the arrest warrants to be executed.

[2] Subsequent citations to the lapel video will include reference to the time stamp in the bottom right of the screen.

the investigation.  He identified another woman, not Ms. Perez, who had also been sitting with the group of motorcycle club members and told Deputy Vigil that she was friendly with the bartender at the saloon, implying that the deputy should interview the bartender.  *See id*. at 1:39-1:45.  He then suggested that the deputy check the video cameras that were in the bar facing the front windows, as well as the camera outside the saloon.  *See id*. at 1:50-1:59.  He also advised Deputy Vigil that when he and his wife first observed the group of motorcycle club members, they wondered how many of them were "1080," referring to a law enforcement code for an individual who is armed and dangerous.  *Id.* at 2:01.

Chief Romero then continued with what he observed regarding Defendant Norton and Ms. Perez, as he and his wife sat inside the restaurant at Byron T's within close proximity to the group of motorcycle club members.  Chief Romero recalled that when the individuals confronted by law enforcement officers stood up and raised their hands, a woman (Ms. Perez) stood up behind one of the men (Defendant Norton).  *See id*. at 2:22-2:42. Chief Romero's wife then demonstrated to Deputy Vigil how Norton stepped in front of Ms. Perez and how she saw Ms. Perez lift Norton's vest.  *See id.* at 3:10. Chief Romero's wife stated that she could not see if Ms. Perez took something out of the area where she lifted the vest or put something in because her view was obstructed by a planter or vase, which Chief Romero's wife referred to as a "flower thing."  *Id*. at 3:17, 3:48.  Chief Romero agreed, stating, "All I saw was the vest go up."  *Id*. at 3:50. Deputy Vigil then asked him if he saw anything removed or anything placed by the girl, and Chief Romero shook his head, "No."  *Id*. at 3:55. At no point during this interview, which occurred at the scene of the incident, did Chief Romero ever say that he saw the woman remove an object from the man and place it into her black purse.

On October 25, 2021, Deputy Vigil submitted a Statement of Probable Cause in San Miguel County Magistrate Court to support the warrantless arrest of Defendant Norton.  In the statement, Deputy Vigil recounted her interview with Chief Romero and his wife:

> I later made contact with two witness' who told me they observed S. Norton step in front of A. Perez and A. Perez lift up S. Norton's leather vest in the back, however they did not see if anything was removed or placed. The firearm was located on A. Perez's person inside a black purse she had around her neck after investigators asked if she had any firearms on her and she states yes. S. Norton is being charged with Unlawful carrying of a firearm in a liquor establishment.

Doc. 97-1 at 1.

### B.  The Application for a Search Warrant and the Preliminary Hearing Before a United States Magistrate Judge

On November 1, 2021, Fourth Judicial District Attorney Tom Clayton contacted the Federal Bureau of Investigation ("FBI") and requested assistance with the incident involving Defendant Norton.  Doc. 97-2.  On November 2, 2021, FBI Special Agent Bryan Acee ("Agent Acee") interviewed Chief Romero, whom he knew to be a law enforcement officer. Doc. 135-1 at 45 (Transcript of Proceedings, November 16, 2023). The next day, on November 3, 2021, Agent Acee submitted an affidavit in support of his application for a search warrant to a United States Magistrate Judge to obtain a sample of Mr. Norton's DNA by buccal swab.  Doc. 97-3.  The purpose of the buccal swab was to obtain DNA samples from Defendant to compare to any DNA found on the gun located in Ms. Perez's black purse.  Doc. 97-3 at ¶8.  In the affidavit, Agent Acee provided information to establish probable cause for obtaining the DNA evidence, claiming that the information was relayed to him by Chief Romero.  In the affidavit, Agent Acee wrote, "Chief Romero observed PEREZ remove an object from the small of NORTON's back and place it into her black purse." *Id*. at ¶5.  Based on the information provided in the application submitted by

Agent Acee, the United States Magistrate Judge authorized the search warrant and the requested

DNA samples were obtained from Defendant.  Six days later, on November 9, 2021, the United

States Magistrate Judge held a Preliminary Examination/Detention hearing in the matter.  Doc.

100-1.  At the preliminary hearing, Agent Acee testified consistent with his affidavit in support of

the search warrant.  More specifically, Agent Acee testified that Chief Romero had told him that

he had observed Defendant Norton's girlfriend reach under his leather motorcycle vest and remove

an object from his waistband and put it into her purse.  *See id*. at 11.

### C.  State Court Proceedings

On November 30, 2021, a hearing was held in San Miguel County Magistrate Court in the

matter concerning the state charges brought against Defendant's girlfriend, Ms. Perez, for

unlawfully possessing a firearm in a liquor establishment.  At that hearing, Chief Romero provided

sworn testimony regarding his extensive experience with law enforcement, including the fact that

he was a Captain with the Las Vegas police department for 22 years and the Investigations

Commander for the same department for the last part of his career.  Doc. 108, Ex. 2 at 9:19.[3]  He

testified that during his career he worked on cases involving outlaw motorcycle clubs and that, in

his experience, New Mexico is a Bandidos[4] state, so it was strange to see a Mongol in Las Vegas.

*See id*. at 9:23.  He then recounted how, during the evening in question, he and his wife, while

sitting inside the restaurant area at Byron T's Saloon, noticed a group of Mongols and surmised

that they were probably all armed.  *See id*. at 9:29.  Chief Romero continued that he saw Ms. Perez

get up and walk behind Defendant. *See id*. at 9:31. He then saw Defendant's jacket go up and then

Ms. Perez went back to the seating area and everyone put their hands up. *See id.* at 9:32. Chief

---

[3]  Exhibit 2 of Doc. 108 is the audio recording of the November 30, 2021, state court proceeding.
Citations refer to the time stamp of the audio recording.

[4]  "Bandidos" refers to another motorcycle club in New Mexico.

Romero explained that he could not see if Ms. Perez grabbed anything, but it appeared she did. *See id*.   On cross examination by defense counsel, Chief Romero explained that his belief Ms. Perez may have taken something from Defendant Norton was based on "looking at the situation afterwards," and that "there'd be no reason to just go up there and tuck his shirt in …" *Id.* at 9:36.

At no point in his state court testimony did Chief Romero ever testify that he saw Ms. Perez take an object from Defendant's waistband and place it into her black purse.

### D.   The *Franks* Hearing

On April 4, 2022, an FBI forensic examiner issued a report regarding the DNA evidence collected from Defendant Norton which, according to the Government, found very strong support for the inclusion of Defendant's DNA profile on the firearm found in Ms. Perez's purse on October 23, 2021.  Doc. 108 at 5.

On September 29, 2023, Defendant filed his Motion to Suppress Evidence, arguing that the Court should suppress the DNA evidence taken from him because it was obtained in violation of the Fourth Amendment and the Supreme Court's decision in *Franks*, 438 U.S. at 154, 98 S.Ct. 2674.  Doc. 97.  Pursuant to *Franks*, Defendant requested the Court hold a hearing to determine whether the affidavit submitted by Agent Acee contained a false statement that was knowingly or recklessly made and, if it was, whether without it the warrant could not have been lawfully issued. *See id*. at 3-5. On November 8, 2023, this Court granted Defendant's request for a *Franks* hearing, finding that Defendant had made a substantial preliminary showing that a materially false statement, made intentionally, knowingly or recklessly, could have been included in the probable cause affidavit. Doc. 124.  On November 16, 2023, this Court held the *Franks* hearing, during which both Agent Acee and Chief Romero testified.  Doc. 131.

### 1) __Chief Romero's testimony at the *Franks* hearing__

Chief Romero testified before this Court that sometime in October 2021, he and his wife had gone to Byron T's Saloon to have a beer.  Doc. 135-1 at 18. While they were sitting at a table inside the saloon that looked over the outside patio, Chief Romero recalled that he noticed several individuals he believed to be members of the "Mongrels," a motorcycle club.[5]  *Id*. at 19.  Chief Romero explained how his wife had wondered how many of them were armed and he had told her, "Probably all of them."  *Id*. at 20. At some point, Chief Romero noticed a man and a woman in the group stand up and raise their hands.  *See id.* He then noticed that a man who had arrived in a white vehicle was holding a gun to the individuals.  According to the Chief, the woman then walked up to the man next to her, picked up his jacket vest, and grabbed something from it and then stepped back.  *See id*. Upon further examination, Chief Romero conceded that he did not actually see the woman grab something but thought that she reached under the vest "*like* she was grabbing something," but he didn't see what she grabbed.  *Id.* at 21. The Chief also recalled speaking to an FBI agent (Agent Acee) and confirmed that he provided the agent the exact same information, including the fact that he never saw an object being taken from Defendant. *See id.* at 23.[6] On cross examination by the Government, Chief Romero conceded that "it was possible" he told the FBI agent that he saw the woman lift the man's jacket and pull something out of the back of his jacket. *Id.* at 25.   On redirect examination by the defense, the Chief confirmed that he did not actually see a gun or any other object during the interaction between the woman and the man.  *Id*. at 26.

---

[5] While Chief Romero referred to the "Mongrels," the actual name of the motorcycle club appears to be the "Mongols."  *See* Doc. 97-3 at ¶3.

[6] Chief Romero testified that he had told officers he thought the woman had grabbed a weapon from the back of Defendant's pants because, in his experience with bikers, "they have the weapons stuffed in the back of their pants." *Id*. at 24.

Notably, Chief Romero again did not testify that he ever saw the woman take an object from Defendant's waistband and place it into her black purse.

    **2) <u>Agent Acee's testimony at the *Franks* hearing</u>**

Special Agent Acee testified at the *Franks* hearing and explained how he became involved in what was originally a state investigation and prosecution. He recalled that in November of 2021, the District Attorney for San Miguel County[7] contacted him regarding the case against Defendant Norton. *See id*. at 43. The District Attorney provided Agent Acee with information about Norton's arrest at Byron T's Saloon, including that officers arrested him because they believed his girlfriend had removed a firearm from his waistband. *See id*. at 44. Agent Acee testified that, in order to investigate a potential felon in possession charge, he determined he would probably need a search warrant for Norton's DNA. *See id*. According to Agent Acee he reviewed the initial reports regarding the case, including the state criminal complaint and Deputy Vigil's report, but found that the complaint contradicted what the deputy wrote in her report. *See id*. at 44-45. Agent Acee did not further explain the contradictions he observed, but stated that after learning the witness who observed the alleged transaction between Norton and his girlfriend was a law enforcement officer, he "thought it best to go to the source of the information and not worry so much about what the booking officers had written." *Id*. at 45.

Agent Acee then explained what occurred when he spoke to Chief Romero, the law enforcement officer he was referring to, on November 2, 2021. According to the agent, Chief Romero again retold the story about how he and his wife were having dinner at a saloon in Las Vegas when they noticed several motorcycle club members seated close to them on the outside

---

[7] It was the Fourth Judicial District Attorney who contacted Agent Acee, but that office covers San Miguel County, New Mexico.

patio of the saloon.  *See id*. at 46.  Agent Acee recalled that Chief Romero told him officers converged on the scene, pointed guns and told the group of motorcycle members to get on the ground.  *See id*.  After that, a Mongol stepped in front of a female who was seated.  Agent Acee then testified that Chief Romero told him that the female lifted up the Mongol's vest, took an object from the vest and put it in her purse.  *See id*. at 47.  Based on that information, Agent Acee drafted a federal search warrant affidavit and a criminal complaint.  *See id*.  He then sent the criminal complaint to the investigators with the District Attorney's Office because they were the lead investigators in the case and asked them to "fact check it."  *Id.* at 48.  The investigators responded that the criminal complaint looked good and they didn't have any changes or edits.  *See id*.  During the *Franks* hearing, Agent Acee was then asked to review paragraph 8 of the search warrant affidavit, and confirmed that it stated, "Chief Romero observed Norton stand up, step in front of Andrea Perez, remove an object from the small of Norton's back and place it in her black purse." *Id.* at 50.  Agent Acee confirmed that this is what Chief Romero had told him. *See id*.  Agent Acee also added that, before swearing to the search warrant affidavit on November 4, 2021, he contacted Chief Romero and confirmed the information was correct.  *See id*. at 51.

Agent Acee then went on to testify that he only reviewed the lapel video depicting what Chief Romero and his wife had said on the day of Norton's arrest after Defendant filed his motion to suppress and request for a *Franks* hearing, approximately two years after he submitted his first application for a search warrant. *See id*. at 52.  He was also provided, for the first time, the audio recording of the testimony Chief Romero provided in San Miguel County Magistrate Court in the matter concerning the state charges brought against Defendant's girlfriend, Ms. Perez.  *See id*.  Agent Acee did not comment further on the interview recorded on Deputy Vigil's lapel camera footage, but did testify that Chief Romero's state court testimony called into question the veracity

of what Chief Romero had told him during their interview on November 2, 2021. *See id*. at 53. Agent Acee stated that "the most crucial thing that [stood] out to [him]" was that in his sworn testimony in court, Chief Romero never mentioned the black purse belonging to Ms. Perez. *Id.*

### E.  The Subsequent Affidavit in Support of a Second Search Warrant

As stated previously, on September 29, 2023, Defendant Norton filed his motion to suppress the DNA evidence obtained from him. Doc. 97.

On October 11, 2023, the Government requested an extension of time to file a response to the motion to suppress, which was not opposed by Defendant Norton.  Doc. 103.

On October 13, 2023, two days after the Government requested that it be given more time to respond to Defendant's motion, and approximately two weeks after Defendant filed his motion to suppress and request for a *Franks* hearing, Agent Acee submitted a second application for a search warrant seeking to obtain the same DNA evidence to be taken for a second time by buccal swab from Defendant Norton. Doc. 108-3.  The second warrant was sought and obtained, not from the original United States Magistrate Judge in the District of New Mexico who had approved the first warrant, but from a United States Magistrate Judge in the District of Nevada.  *See id*.  The Government did not notify this Court that a second warrant was being sought, even though the issue regarding the constitutionality of the first warrant was pending and awaiting a response from the Government.  The second affidavit submitted to the magistrate judge in Nevada by Agent Acee relayed primarily the same information as the first affidavit, including the statement that, "Chief Romero observed Perez remove an object from the small of Norton's back and place it into her black purse." *Id*. at ¶6.  Agent Acee added that, in other court proceedings, "Romero has confirmed he could not personally see what, if anything, Ms. Perez grabbed, but that it appeared based on his

observations that Ms. Perez had grabbed something from the back of NORTON's jacket." *Id*. at ¶7(e).

At the *Franks* hearing, Agent Acee explained that he sought the second warrant for the same DNA evidence because he realized the information Romero had provided him was "different" from what the Chief had testified to in other proceedings, and to him, that called into question the veracity of what Romero had told him.  Doc. 135-1 at 53, 54.

## II.
## LEGAL STANDARDS

A search warrant must be voided and the fruits of the search suppressed where a court (1) finds that, whether knowingly or recklessly, a false statement was included or material information was omitted from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause. *See Franks*, 438 U.S. at 155-56, 98 S. Ct. 2674, 57 L.Ed.2d 667; *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008).  The Tenth Circuit has held that the government may be held "accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit."  *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing, e.g., *United States v. Wapnick*, 60 F.3d 948, 956 (2nd Cir. 1995), *cert. denied*, 518 U.S. 1021, 116 S.Ct. 2256, 135 L.Ed.2d 1075 (1996)).  The burden is on the defendant challenging the validity of a search warrant under *Franks* to show, by a preponderance of the evidence, that a false statement or material omission was included in the search warrant affidavit which was material to a finding of probable cause. *See Franks*, 438 U.S. at 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667; *Kennedy*, 131 F.3d at 1376.

# III.
# DISCUSSION

Based on the parties' briefing and arguments made before the Court, there are four primary legal issues to be addressed: (1) whether there was a false statement or material omission in the search warrant affidavit submitted by Agent Acee that was knowingly or recklessly made and which was material to a finding of probable cause; (2) whether, if a false statement or omission was included in the search warrant affidavit that was knowingly or recklessly made by Chief Romero, he can be considered a government employee such that the Government can be held accountable for the false statement or omission; 3) whether or not the good faith exception or inevitable discovery exception warrant the admission of the DNA evidence even if there was a constitutional violation and (4) whether the new search warrant for the same evidence moots Defendant's suppression argument.

### A. Defendant Has Shown a *Franks* Violation in the Affidavit in Support of the Application for the Search Warrant.

### 1) <u>There was a false statement and an omission included in the affidavit.</u>

Defendant argued in his original briefing that Agent Acee committed a *Franks* violation by including the following sentence in the search warrant affidavit: "Romero observed PEREZ remove an object from the small of NORTON's back and place it into her black purse." Doc. 97 at 2; Doc. 97 -3 at ¶5. According to Defendant, this statement was untrue - Chief Romero simply did not see Ms. Perez remove anything from Defendant or place anything into her black purse. Therefore, argued Defendant, there are only two possible explanations for how Agent Acee could "completely misconstrue a crucial piece of evidence." Doc. 97 at 4. The first explanation is that Agent Acee did not read any of the charging documents or speak to any witnesses or the district attorney who referred the case to him. *See id.* If he had, he would have known that Chief Romero

never claimed he saw any object removed from Norton or placed into Ms. Perez's purse. *See id*. The second possible explanation for the inclusion of the false statement is that Agent Acee "embellished the evidence in order to obtain a warrant to obtain Mr. Norton's DNA." *Id*. According to Defendant, either explanation "is equally shocking" and satisfies the first *Franks* factor. *Id*.

In his supplemental briefing on his motion to suppress, after the Court heard testimony from both Chief Romero and Agent Acee at the *Franks* hearing, Defendant made the additional argument that, if Agent Acee's testimony is to be believed, then Chief Romero made a false statement to Agent Acee. Doc. 135 at 1. Defendant points out that although Chief Romero initially testified at the *Franks* hearing that he thought he saw "something" removed from the small of Norton's back, he finally conceded that he never saw an object, a concession that was consistent with what he had originally told Deputy Vigil on the day that the incident at Bryan T's Saloon occurred. *See id*. at 2. Regardless of whether it was Chief Romero or Agent Acee who made the false statement knowingly and/or recklessly, Defendant takes the position that there was a *Franks* violation that requires the invalidation of the search warrant and the suppression of the DNA evidence. *See id*. at 8-9.

In its original response, the Government argued that Agent Acee did not intentionally, or with reckless disregard for the truth, misrepresent Romero's statements, and therefore there was no *Franks* violation. Doc. 108 at 7. The Government asserted that, at the time he swore out his affidavit on November 3, 2021, Agent Acee did not have the lapel camera footage from Deputy Vigil taken on the day of Norton's arrest. *See id.* He also could not have foreseen that, 27 days later, Chief Romero would provide sworn testimony in state court and not mention anything about a black purse. *See id*. In its supplemental briefing ordered by the Court, the Government further

contends there is insufficient evidence to establish Chief Romero made a false statement because no one ever asked him directly, either during the state court proceedings or during the *Franks* hearing, whether he saw Ms. Perez place something that she took from Defendant into her black purse.   Doc. 136 at 3.   According to the Government, Defendant's argument that Chief Romero may have made a false statement that was included in the search warrant affidavit "requires us to take several major leaps . . . we have to imagine what Romero might have said, despite never having been asked directly, and then further assume the response would have been inconsistent with his prior statement to SA Acee."   *Id*. at 4.

The Court finds that, based on the evidence before it, Defendant Norton has shown it is more likely than not that the assertion in the search warrant affidavit that Chief Romero saw Ms. Perez remove an object from Defendant and place it into her black purse was a false statement. On the day of the incident that led to the arrest of Defendant Norton and Ms. Perez, Chief Romero spoke to Deputy Vigil about what he and his wife had just observed, and he stated, unequivocally, that, "All [he] saw was [Defendant's] vest go up." Doc. 97, Ex. A at 3:50. Just as plainly, Chief Romero confirmed that he did not see anything removed by Ms. Perez from Defendant Norton. *See id*. at 3:55. Chief Romero's statement was recorded both by lapel camera video and documented by Deputy Vigil in her Statement of Probable Cause.  In his later sworn testimony in state court, Chief Romero again confirmed that he did not actually see Ms. Perez take anything from Defendant Norton but, "looking at the situation afterward," he only believed that she did because there was no other reason for her to lift his vest up.  Doc. 108, Ex. 2 at 9:36.  The Court determines that, since Chief Romero did not see Ms. Perez take anything from Defendant Norton, he could not have then seen her place anything in her black purse.  The Court further finds that Romero omitted the fact that the view he and his wife had of Norton and Ms. Perez was obstructed

by a flower plant or vase, described by his wife as a "flower thing."  Doc. 97, Ex. A at 3:17, 348. This omission was significant and material, given that the obstruction explained why Romero initially denied that he saw anything removed from Defendant Norton by Ms. Perez.

2) **The false statement was included and an omission made in the search warrant affidavit with reckless disregard for the truth.**

For a court to rule that there has been a *Franks* violation, it is not enough for there to be a false statement or material omission in the search warrant application. The statement must have been made intentionally, or with reckless disregard for the truth.  *See Franks,* 438 U.S. at 155, 98 S.Ct. 2674.  Therefore, having concluded that there was a false statement included in the affidavit, the Court must now determine whether either Agent Acee or Chief Romero acted with the requisite mental state at the time the statement was made.  *See Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

*Agent Acee*

Defendant argued in his initial motion to suppress that Agent Acee was either reckless in his description of what Romero witnessed, or he intentionally manufactured the statement about the black purse to be included in his search warrant affidavit.  Doc. 97 at 4.  The Court finds that, based on the evidence before it, Defendant has not met his burden of showing that either of those scenarios are true.  As discussed above, Agent Acee testified at the *Franks* hearing that Chief Romero told him that he saw Ms. Perez remove an object from Defendant Norton's vest and place it into her purse.  Doc. 135-1 at 47.  He also testified that he sent the information he intended to include in his search warrant affidavit to both the investigators from the District Attorney's office and to Chief Romero himself, and the information was confirmed by both.  *See id*. at 51. Despite having the burden of showing a *Franks* violation, Defendant Norton did not cross examine Agent Acee at the *Franks* hearing regarding his account of what Chief Romero told him; he also did not

question Agent Acee's testimony about the process he engaged in to confirm the accuracy of the information he intended to include in his search warrant affidavit.   Although Defendant pointed out in his initial motion that Agent Acee did not review the lapel video of Chief Romero's interview by Deputy Vigil, there was no testimony or evidence presented by Defendant to show that Agent Acee even knew that the lapel video existed.   Even if he had, Defendant cites to no law that would have required Agent Acee to review every document or question every possible witness before determining there was sufficient evidence to request the original search warrant.   As the Tenth Circuit has recognized, the failure to "exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth," and at most can be considered mere negligence.   *Beard,* 24 F.3d at 116 (internal quotation marks and citation omitted).

*Chief Romero*

In his supplemental briefing, based on the testimony presented at the *Franks* hearing, Defendant takes the position that Chief Romero was the government official who either deliberately or recklessly told Agent Acee that he saw Ms. Perez take something from Defendant Norton and place it into her purse, which was a false statement.  Doc. 135 at 1-4.  In response, the Government argues that "the record is devoid of [malfeasance] upon which Defendant can base [the assertion that he intentionally lied or was reckless]; Romero cannot be said to have lied about the purse where he told [Agent] Acee about the purse and was never thereafter questioned about it."  Doc. 136 at 4.

Notwithstanding the fact that there is a stark contradiction between Agent Acee's testimony and Chief Romero's testimony regarding what Chief Romero stated to Agent Acee, the record lacks any direct evidence that Chief Romero intentionally concocted a lie when he spoke to Agent

16

Acee.  However, contrary to the Government's contention that the record is "devoid" of evidence showing that Chief Romero acted with reckless disregard for the truth, the Court finds there is sufficient and direct evidence from which to infer Chief Romero was reckless when he described to Agent Acee the events that unfolded on the day Defendant was arrested.  *See Kapinski*, 964 F.3d at 908 ("A reviewing judge may *infer* recklessness from 'circumstances evincing obvious reasons to doubt the veracity of the allegations.'") (quoting *Beard*, 24 F.3d at 116).   As discussed above, the most credible evidence of what Chief Romero observed on the day in question is what he told Deputy Vigil immediately after Defendant's arrest, which is that he did not see Ms. Perez remove an object from Defendant.  In fact, Chief Romero and his wife were unable to see what Ms. Perez was doing because their view was blocked by a "flower thing" and all he observed was Defendant's "vest go up."   But since that day, Chief Romero's account has been somewhat in flux.   On November 30, 2021, at the state court proceedings involving Ms. Perez, Chief Romero agreed that he saw Ms. Perez "grab something out of [Defendant's] waistband area," but could not see what it was.  Doc. 108, Ex. 2 at 9:36.  Then he confirmed that "she took something out of there," but then admitted that this was only an after-the-fact assessment.  *Id.* at 9:36-9:37. He also explained that he believed Ms. Perez took something from Defendant, not based on what he saw, but on what he knew was the "demeanor of the motorcycle club."  *Id.*   Finally, on cross examination, Romero came full circle and admitted he did not see Ms. Perez take anything from Defendant.  *See id.* at 9:37.

At the *Franks* hearing before this Court on November 16, 2023, Chief Romero's testimony again was muddled as to what he observed at Byron T's Saloon on October 23, 2021.  Initially, he stated he saw that Ms. Perez "grabbed something from [Defendant's] jacket and then stepped back."  Doc. 135-1 at 20.  He then clarified that "she went in *like* she was grabbing something,"

but he didn't actually see what she grabbed and, in fact, didn't see an object at all. *Id*. at 21. Then, although he had moments before testified during his examination by the defense that he told Agent Acee he never saw an object being taken by Ms. Perez, he stated, in response to a question from the Government, that he told Agent Acee he saw Ms. Perez lift up Defendant's jacket and pull an object out of the back of his jacket. *See id*. at 25. Chief Romero would pivot again upon re-examination by the defense to confirm that he did not actually see a gun, or any object, being removed by Ms. Perez. *See id*. at 26.

Based on the varying and inconsistent statements provided by Chief Romero on the day of Defendant's arrest and during the state court proceedings against Ms. Perez, as well his admission during the *Franks* hearing that he told Agent Acee something that was inconsistent with what he in fact observed, the Court finds it is more likely than not that Chief Romero told Agent Acee he saw Ms. Perez place an object she had taken from Defendant Norton's waistband into her black purse, and that statement was made with reckless disregard for the truth. As discussed above, this was a false statement and there are sufficient circumstances evincing obvious reasons to doubt the veracity of the information he provided to the FBI and to infer that Chief Romero must have entertained serious doubt as to the accuracy of the account he provided to Agent Acee. *See Kapinski*, 964 F.3d at 908; *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). Moreover, in addition to the amorphous nature of his description of the events, Chief Romero also omitted a material fact during his interview with the FBI - that the view he and his wife had of what Ms. Perez was doing was blocked by a flower or plant vase - further evincing the recklessness of his statements. *See DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) ("Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause."); *see also Kapinski*, 964 F.3d at 908 ("[T]he egregiousness of an omission may, in some circumstances,

lead to an inference of recklessness.).   The Defendant has met his burden of showing, by a preponderance of the evidence, that Chief Romero's statement to Agent Acee was made in a reckless manner and in disregard for the truth.[8]

### 3)  The false statement and omission in the affidavit were material to a finding of probable cause.

Under *Franks,* once the existence of a false or reckless statement or omission in a search warrant affidavit has been established by a preponderance of the evidence, courts must determine whether that statement, or omission, was material to a finding of probable cause.  *Franks*, 438 U.S. at 156, 98 S.Ct. 2674, 57 L.Ed.2d 667.  To do so, "a court must strike any intentional, knowing, or reckless misstatements in the warrant application affidavit and assess the affidavit without them." *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015).   "[If] the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 156, 98 S.Ct. 2674, 57 L.Ed.2d 667.  Where an affidavit contains a material omission, "the [court's] job is much the same—[it] must ask whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts.  If so, the contested misstatement or omission can be dismissed as immaterial.  If not, a Fourth Amendment violation has occurred, and the question turns to remedy." *Herrera*, 782 F.3d at 575; *see also*

---

[8] The Government argues that the Court cannot determine whether Chief Romero made a false or reckless statement to Agent Acee because Romero was not specifically asked during court proceedings if he saw Ms. Perez place an object in her black purse.  Doc. 136 at 3.  The Court finds no merit in that assertion.  At both the *Franks* hearing and in the state court proceeding, Chief Romero was asked to describe what happened at the Byron T's Saloon on October 23, 2021, and he provided a full account of his observations – never mentioning the purse.  There is no reason to believe that Chief Romero left out an important detail such as the one action that linked Norton to the firearm at issue simply because he wasn't asked that question directly.  It is more likely that, under oath, the Chief did not mention seeing Ms. Perez place an object in her purse because he did not see that happen.  Nevertheless, according to Agent Acee, that is what he told the FBI.

*United States v. Basham,* 268 F.3d 1199, 1204 (10th Cir. 2001) ("[T] the search warrant must be voided if the affidavit's remaining content is insufficient to establish probable cause. This prohibition likewise applies to intentional or reckless omissions of material facts, which, if included, would vitiate probable cause.") (citing *Franks*, 438 U.S at 171-172, 98 S.Ct. 2674, 57 L.Ed.2d 667); *Stewart v. Donges*, 915 F.2d 572, 581-83 (10th Cir. 1990).

To determine whether probable cause remains in a search warrant affidavit after the excision of a false statement or the inclusion of a material omission, "[t]he [remaining portions of the] supporting affidavit must provide a substantial basis to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Alqahtani*, 73 F.4th 835, 842 (10th Cir. 2023) (quoting *United States v. Long*, 774 F.3d 653, 658 (10th Cir. 2014)).   Further, to establish such probable cause, "the warrant application must establish 'a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched." *Id.* (quoting *United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998)).

Defendant argues that absent the false statement that, "Romero observed Perez remove an object from the small of Norton's back and place it into her black purse," there would not have been enough probable cause to issue a warrant for his DNA.  According to Defendant,

> This piece of information is material because without it there isn't probable cause to take a sample of Mr. Norton's DNA. Without this statement, the affidavit contains a recitation of Mr. Norton's criminal history, his purported membership in a motorcycle club, his companions having warrants, and his girlfriend admitting to possessing a gun that is then found in her purse. These facts do not establish probable cause to take Mr. Norton's DNA. But for Mr. Acee's untruthful statement, no warrant should have been issued.

Doc. 97 at 4-5.

The Government disagrees and argues that, even without the challenged language in the affidavit, Romero's other statements about what he saw that night would still be sufficient for probable cause. The Government highlights the following testimony by Romero from the state court proceeding regarding Ms. Perez which, in the Government's view, supports a finding of probable cause: Romero thought something was removed because he saw the vest move; he noticed Mr. Norton was a Mongol (a member of a motorcycle club); he and his wife discussed whether the Mongols were armed (because in his experience he thought they were likely all armed); he couldn't see if Ms. Perez grabbed anything, but it appeared she did; and that in his experience, people carry firearms concealed in the back of their waistbands.  Doc. 108 at 11-12. In its supplemental briefing, the Government further argues that,

> Romero unequivocally saw Defendant's girlfriend grab something from the small of Defendant's back. Paragraph 6 of the original search warrant affidavit clearly indicates that DA Investigator Dillon Encinias located a firearm in Defendant's girlfriend's purse. The same woman who had just removed something from Defendant's waistband. The balance of Romero's observations, coupled with the fact that a gun was, in fact, found in her purse, supports probable cause that Defendant's DNA would be evidence material to determining whether this was the object she had removed from his waistband.

Doc. 136 at 4-5.

The Court notes that once the false statement is removed from the search warrant affidavit, only the following information remains:

- On October 23, 2021, police surveillance was established on a group of Mongols Motorcycle Club (MMC) members who had congregated on the patio area of the Byron T Saloon in Las Vegas, New Mexico.  Doc. 97-3 at ¶ 3.

- Two members of this group, Mark Montoya and Gilbert Lucero, had active felony arrest warrants for aggravated assault with firearms and conspiracy.  *See id.*

- Law enforcement officers confirmed that Montoya and Lucero were among the group of MMC members. *See id*. at ¶4.

- Officers approached the group and directed the MMC members to place their hands in the air and get on the ground.  The group complied and the officers detained eight members of the MMC. When Montoya was handcuffed, he told officers, "You're lucky I don't shoot you right now." *Id*.

- Pat downs of other MMC members uncovered two firearms and several knives. Lucero and Montoya were arrested on their outstanding warrants. *See id*.

-  Off-duty New Mexico Highlands University Police Chief Clarence Romero notified the arresting officers that he saw Norton stand up with his hands in the air and step in front of Aundrea Perez. *See id*. at ¶5.

- An investigator approached Ms. Perez, who was seated on the patio next to where Norton had been detained, and asked if she had any weapons on her.  Ms. Perez indicated that she had a firearm in her purse, and the firearm in question was retrieved.  Officers arrested Ms. Perez and Norton for the unlawful carrying of a firearm in a liquor establishment.  *See id*. at ¶6.

- Norton is a validated member of the MMC in Arizona and close associate of several New Mexico MMC members.  Acee believes that this "motorcycle club" may more accurately be described as an outlaw motorcycle gang. *Id*. at ¶7.

The Court finds that, absent the false statement at issue, the properly redacted affidavit does not provide a substantial basis to believe there was a fair probability that evidence of a crime, in this case the Defendant's possession of the firearm found in Ms. Perez's purse, would be found from Norton's DNA.   The fact that two of the motorcycle members were being sought by police, that Agent Acee believed that the motorcycle club was an "outlaw motorcycle gang," or that two other individuals at the Saloon had firearms does not provide a substantial basis to conclude that Norton possessed a firearm at some point and that the firearm could be found in Ms. Perez's purse. Nor does the fact that Norton stepped in front of his girlfriend when police, with weapons drawn,

approached the group.  Such an act could be completely benign and subject to many interpretations that did not indicate a crime was being committed.  In short, the only evidence that links the firearm to Norton is the material (and inaccurate) statement in the affidavit that another law enforcement officer saw Ms. Perez remove something from Norton and then place it in her black purse, a statement that was necessary to the issuing magistrate judge's probable cause finding. What is left in the affidavit after that false statement is removed simply does not provide a reasonable nexus between the firearm that Ms. Perez told police she had in her purse and Norton's DNA.  *See Alqahtani*, 73 F.4th at 842.

The Government, however, insists that the requisite probable cause still would have existed because, "Romero unequivocally saw Defendant's girlfriend grab something from the small of Defendant's back," investigators "located a firearm in Defendant's girlfriend's purse," and Romero testified in state court proceedings to other facts evincing probable cause, including that based on his knowledge of motorcycle clubs, he believed the motorcycle club members were armed.  Doc. 108 at 10-13; Doc. 136 at 4-5.   The Court is not persuaded by these arguments for several reasons.  First, as discussed above, it is more likely than not that Romero did not see Ms. Perez remove an object from Norton.  Second, it would be too far a stretch to say that Norton must have possessed the firearm simply because Ms. Perez, his girlfriend, informed police that she had a firearm in her purse.  But more importantly, the Court does not find any of this relevant to the task at hand because the Court may only review what facts remain in the original warrant once the false or misleading statement is removed, not what Romero could have testified to, what excerpts from his testimony could have been included by Acee in the warrant application, or what evidence was ultimately found.  *See Franks*, 438 U.S. at 155-56, 98 S.Ct. 2674; *Herrera*, 782 F.3d at 575; *Stewart*, 915 F.2d at 582-83.

For these reasons, the Court finds that the false statement included in the search warrant affidavit was material to a finding of probable cause and without it, there would not have been probable cause to obtain DNA evidence from Defendant. In addition, the Court finds that the omission of the fact that Romero's view was blocked was material because had it been included in the affidavit, it would have further confirmed to the issuing magistrate judge that there was no link between the firearm and Norton, likely vitiating probable cause.  *See Herrera*, 782 F.3d at 575; *Basham,* 268 F.3d at 1204.

**B.  The Government May Be Held Accountable for the False Statement Made by Chief Romero to Agent Acee.**

The Tenth Circuit and other circuit courts of appeal have determined that the government may be held "accountable for statements made not only by the affiant [of an application for a search warrant] but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit." *Kennedy*, 131 F.3d at 1376 (citing *Wapnick*, 60 F.3d at 956, cert. denied, 518 U.S. 1021, 116 S.Ct. 2256, 135 L.Ed.2d 1075 (1996); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992); *United States v. Calisto*, 838 F.2d 711, 714 (3d Cir. 1988); *United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir. 1984)).  Courts have also determined that a *Franks* violation can occur even where the non-affiant government employee who provides a false statement or omission and the affiant officer are from different law enforcement organizations or even different states.  *See id.* (finding a *Franks* violation where non-affiant was local police officer and affiant was federal agent); *United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir. 2006) (concerning an inspector from Arizona who gave potentially misleading information to an FBI agent in Minnesota); *United States v. Barthelman*, No. 13-10016-MLB, 2013 WL 3946084 (D. Kan. July 31, 2013) (*Franks* violation where officers were located in Ohio and Kansas); *Auguste*

*v. Sullivan*, No. 03-CV-02256-PAB-KLM, 2009 WL 902385, at *13 (D. Colo. Mar. 26, 2009) (Colorado officer relied on false information provided by a California officer).

In this case, Defendant argues that Chief Romero is clearly a government employee and thus, under *Kennedy*, the Government should be held accountable for the reckless statement he made to Agent Acee. Doc. 135 at 4-5. Defendant points out that Chief Romero testified in the state court proceeding that he was Chief of Police at New Mexico Highlands University, a state-funded public university, at the time of the incident at Byron T's Saloon. Public universities, like New Mexico Highlands University, argues Defendant, are typically considered governmental entities where constitutional rights are concerned, and campus police officers at public universities are treated as state actors, expected to respect constitutional rights under the Fourth Amendment. *See id.* at 5-6. Moreover, Defendant contends that, pursuant to state statute, campus police officers have legitimate police duties - they can enforce laws, ordinances, traffic regulations, and make arrests. *See id*. (citing N.M. Stat. Ann. § 29-5-3(D)).

The Government concedes that Chief Romero "is clearly a government employee" and "acknowledges that individuals from different federal or state agencies can be deemed government agents for *Franks* purposes." Doc. 136 at 8, 11. Nevertheless, the Government disputes the notion that this means it can be held accountable for any false statements attributable to Romero. *See id*. at 8. The Government asserts that, although Chief Romero is a law enforcement officer, in this instance he "had none of the trappings of an investigator; he had no body worn camera, no badge, no gun, and was not in uniform." *Id*. at 5. According to the Government, *Kennedy* is distinguishable, as are other cases where the Government was held accountable for false statements made by a government employee who was not the affiant, because in those cases the non-affiant government employee held some type of investigatory role. *See id*. at 6-10. In *Kennedy* itself,

notes the Government, both the local police officer (non-affiant government employee) and the DEA agent (affiant) were on duty, actively engaging in a law enforcement investigation. *See id*. at 7.  In this case, because Chief Romero did not play an investigative role, the Government contends that any false statement he may have made to Agent Acee cannot form the basis for a *Franks* violation.

The Court disagrees.  Neither the Supreme Court nor the Tenth Circuit, have ever expressly limited the scope of *Franks* violations to statements made only by affiants or non-affiant government officials who have an official role in the underlying criminal investigation.  *See Franks*, 438 U.S. at 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667; *Garcia-Zambrano*, 530 F.3d at 1258. Moreover, there are several reasons, in addition to the lack of legal authority for the Government's investigative role theory, why the Court will not follow the rule proposed by the Government. First, the relevant case law states simply that a "government employee" other than the affiant can provide the basis for a *Franks* violation and the subsequent suppression of evidence, *see*, *e.g*., *Kennedy*, and both parties agree that Chief Romero is a government employee.  Romero is a state certified law enforcement officer with 35 years of law enforcement experience, is currently the Chief of Police for a public university and was previously a Captain and the Investigations Commander with the Las Vegas Police Department, one of the investigating agencies in this case.

Second, the Court views the Tenth Circuit's decision in *Garcia-Zambrano* to be instructive. That case, like this one, involved an off-duty law enforcement officer who provided false and misleading information to a police detective which was included in an affidavit in support of a search warrant, in that case a warrant to search the defendant's apartment.  *See* 530 F.3d at 1252-53.  The off-duty officer worked as a security officer at the same apartment complex where the defendant lived and claimed that he smelled marijuana coming from the defendant's apartment

and that he had received several complaints from other apartment employees about heavy non-resident pedestrian traffic to the defendant's apartment. *See id*. at 1252. The officer then informed a detective from the Denver Police Department of these facts. Based on this information, the detective prepared an affidavit and obtained a search warrant, leading to the discovery of drugs in the apartment. *See id*. After holding a *Franks* hearing, the district court found that there were several false statements made by the off-duty officer which the affiant, the police detective, included in his search warrant affidavit. The district court concluded that both the off-duty law enforcement officer and the police detective "acted with reckless disregard for the truth in the preparation of the affidavit" and found a *Franks* violation, a determination affirmed by the Tenth Circuit. *See id*. at 1253, 1258.[9]

The Government attempts to distinguish *Garcia-Zambrano*, claiming that in that case the government employee at issue (the off-duty officer) played an investigatory role by questioning others about the odor of marijuana coming from an apartment, affirmatively reaching out to a police detective to provide information, obtaining written statements from witnesses, and drafting a report. Doc. 136 at 9 (citing *Garcia-Zambrano*, 530 F.3d at 1252-53). Here, proffers the Government, Romero did not engage in similar conduct. He "did not reach out to officers, they contacted him." *Id*. He also did not interview any witnesses and did not prepare a report, in "stark contrast" to the off-duty officer in *Garcia-Zambrano*. *Id*.

Contrary to the Government's argument, the Court finds that, even if some role in the investigation was required before Chief Romero's reckless statement or omissions could be found to the basis for a *Franks* violation, Chief Romero's participation in the investigation here suffices

---

[9] Ultimately, the Tenth Circuit did not affirm the district court's suppression order because it determined that, even absent the false statements, the search warrant affidavit in that case was based on other evidence sufficient to establish probable cause. *See id*. at 1260.

because it is similar in many respects to that of the off-duty officer in *Garcia-Zambrano*.  For instance, the Court disagrees with the Government's statement that, unlike the off-duty officer in *Garcia-Zambrano*, Chief Romero was simply an eyewitness who was interviewed by police and that he did not affirmatively reach out to investigating officers to provide information.   The information provided to Agent Acee, which he included in his search warrant affidavit, was that Romero approached the officers who initially detained the motorcycle club members to provide them information about Defendant Norton and his girlfriend.   Doc. 97-3 at ¶5.   Then, after approaching those officers, Chief Romero remained on the premises and waited to speak to Deputy Vigil about what he knew regarding the motorcycle club members.   Doc. 97, Ex. A at 0:00-1:15. Deputy Vigil's lapel video shows that she and another officer were interviewing a woman at the scene when the deputy was told that Chief Romero was waiting to talk with her.   *See id*.   Once Deputy Vigil came over to speak with him and his wife, Chief Romero, without being asked a question, informed the deputy of another individual who may have been involved with the motorcycle club members, referring to a "heavy-set girl" with a tattoo who was still in the restaurant and had been sitting with the motorcycle club members.   *Id*.  He also told the deputy that the bartender and the girl were friendly, implying that someone should speak with the bartender as well.   *See id*. at 1:39-1:45. The Chief then told the deputy that, "according to these guys (referring to saloon staff)," there were cameras in the bar facing the front windows and a camera outside that the deputy might want to check out, indicating that he had already asked the staff about the location of the security cameras.   *Id.* at 1:50-1:59.  He then informed the deputy that his wife was former law enforcement and that both had wondered how many of the motorcycle club members were "1080," using law enforcement code for an armed and dangerous person.[10]   *Id.*

---

[10] *See* New Mexico Police Radio Codes, https://police-codes.com/united-states/new-mexico.

at 2:01.  He also told the deputy that he noticed the emblems on Norton's leather jacket which indicated he was a "full Mongol."  *Id*. at 2:55.  He and his wife then went on to explain that, when law enforcement confronted the group, Norton stepped in front of his girlfriend, but the Chief did not see whether anything was removed from Norton.  *See id*. at 3:51.

Given these facts, the Government's attempt to emphasize a significant factual and legal distinction between the role of the off-duty officer in *Garcia-Zambrano* and Chief Romero in this case is unavailing. The record indicates that Romero, like the off-duty officer in *Garcia-Zambrano*, approached law enforcement to provide assistance and information for the investigation based on his experience and knowledge as a law enforcement officer, including identifying individuals who were with or may have known the motorcycle club members, providing his opinion regarding Norton's status as a member of the Mongols, and stating his belief that all of the motorcycle club members at the Byron T's Saloon were armed.  In addition, although Romero did not write a report, it appears that he may have spoken to or interviewed other individuals about information relevant to the investigation, including the location of cameras inside the saloon, which he suggested should be reviewed for additional evidence.  Although Romero witnessed the events leading to the arrest of Defendant and his girlfriend, just like off-duty officer who witnessed the smell of marijuana coming from the defendant's apartment, he was more than just a bystander. He was a law enforcement officer who provided advice and direction to Deputy Vigil, even suggesting how the investigation at the scene should be conducted.

The Court also notes that an affiant's *reliance* on another government employee's statements is an important factor to consider when determining if the Government can be held accountable for deliberate or reckless false statements made by that government employee.  *See Kennedy*, 131 F.3d at 1376 (holding the Government is accountable for deliberate or reckless false

29

statements by government employees "insofar as such statements were relied upon by the affiant in making the affidavit."). In this case, the records shows that Chief Romero was seen by those conducting the official investigation as an experienced and knowledgeable law enforcement officer who could assist in the investigation and be relied on for credible information. Deputy Vigil, for instance, relied on Romero's statements in her Statement of Probable Cause to support the warrantless arrest of Defendant Norton. Doc. 97-1 at 1. Agent Acee also testified that when he learned Romero was a law enforcement officer, he decided he did not have to speak to the officers who arrested Norton but instead thought it best to go straight to Chief Romero for information. Doc. 135-1 at 45. Thus, although there were other sources of information available, the Government determined it would rely on Chief Romero for information given his status as a law enforcement officer.

Given these circumstances, the Court finds that Chief Romero's participation in the investigation, and the Government's reliance on the information he provided, is sufficient to establish the Government's liability for the reckless statements and omission included in Agent Acee's search warrant affidavit.

### C. There Is No Fourth Amendment Warrant Exception Which Permits the Use of the DNA Evidence in This Case.

"Generally, 'evidence obtained in violation of the Fourth Amendment will be suppressed under the exclusionary rule' – subject to a few exceptions." *United States v. Streett*, 83 F.4th 842, 848 (10th Cir. 2023) (quoting *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014)). The good faith exception and the inevitable discovery doctrine constitute two such exceptions to the exclusionary rule, both of which are raised by the Government in this case. For the reasons stated below, the Court finds that neither of these exceptions are applicable here.

**1) <u>There is no good faith exception for a *Franks* violation.</u>**

The Government argues that, even if there was a constitutional defect in the warrant itself, the good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), would apply and would not require the suppression of the DNA evidence in this case. Doc. 108 at 16. Defendant, however, argues that the good faith exception does not apply to warrants rendered invalid based on a *Franks* violation. Doc. 116 at 4-5.

In *Leon*, the Supreme Court established that evidence obtained pursuant to a warrant that is later found to be defective is not properly excluded when the warrant is reasonably relied on by the executing officer in objective good faith. *See United States v. Gonzales*, 399 F.3d 1225, 1229 (citing *Leon*, 468 U.S. at 916, 104 S. Ct. 3405). However, "the deference given to such warrants 'is not boundless.'" *Id.* (quoting *Leon*, 468 U.S. at 914, 104 S. Ct. 3405 ). As explained in *Leon*, there are several contexts in which this "good faith" exception would not apply, the first being the scenario where a magistrate "was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923, 104 S. Ct. 3405. That scenario, of course, is a *Franks* violation, which the Court has found in this case, and which has led to the Tenth Circuit, and many other courts that have addressed this issue, to hold that "[t]he *Leon* good faith exception does not apply to search warrants granted on the basis of a recklessly or intentionally false affidavit that violates *Franks*." *United Sates v. Orr*, 864 F.2d 1505, 1508 n.3 (10th Cir. 1988); *see also*, *e.g.*, *United States v. Abernathy*, 843 F.3d 243, 257-58 (6th Cir. 2016) ("In the years since *Leon*, this Court and others have repeatedly held that the good-faith exception does not apply when the supporting affidavit contained knowing or reckless falsity in violation of *Franks*.") (internal quotations and citation omitted); *United States*

*v. Vigeant*, 176 F.3d 565, 572 (1st Cir. 1999); *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th

Cir. 1993) ("[U]nder *Leon*, a *Franks* violation is not excused."); *United States v. Colkley*, 899 F.2d

297, 300 (4th Cir. 1990) ("A warrant that violates *Franks* is not subject to the good-faith exception

to the exclusionary rule announced in *United States v. Leon*."); *United States v. Somerlock*, 602 F.

Supp. 3d 791, 823-24 (D. Md. 2022) ("[T]he good faith exception to the exclusionary rule does

not apply to a *Franks* violation.").

Because a *Franks* violation occurred in this case, the good faith exception does not apply

and cannot salvage the invalid warrant here.[11]

### 2) <u>The inevitable discovery exception is not applicable to this case.</u>

Relying exclusively on the Tenth Circuit's recent opinion in *Streett*, the Government

contends that the inevitable discovery exception applies in this case, precluding the suppression of

Defendant's DNA even if the Court were to find the search warrant invalid. Doc. 108 at 17.

Defendant disagrees, contending that the inevitable discovery doctrine does not apply to a legal

scenario like this and, even if it did, the analysis under *Streett* would not lead to the conclusion

that the evidence in this case would have been inevitably discovered.

Under the inevitable discovery doctrine, "illegally obtained evidence may be admitted if it

'ultimately or inevitably would have been discovered by lawful means.'" *Christy*, 739 F.3d at 540

(quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)).  As *Nix*

demonstrates, the inevitable discovery doctrine requires that the means by which the evidence

would inevitably be discovered is independent from the means by which the evidence was actually

– and unlawfully – discovered.  467 U.S. at 448, 104 S. Ct. 2501; *Utah v. Strieff*, 579 U.S. 232,

---

[11] The Government makes no argument concerning the applicability of the good faith exception to *Franks* violations specifically, other than to state its position that the exception should apply because there was no *Franks* violation.

238, 136 S. Ct. 2056 ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."). Consistent with this principle, the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed. *See Nix*, 467 U.S. at 448, 104 S.Ct. 2501 ("[W]hen. . . evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."). The Government has the burden of proving by a preponderance of the evidence that the evidence to be suppressed would have been discovered without the Fourth Amendment violation. *See United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000).

As stated above, the Government rests its entire argument regarding the inevitable discovery rule on the Tenth Circuit's decision in *Streett*. In that case, the defendant had filed a motion to suppress incriminating evidence found in a residence on the basis that the search warrant failed to establish probable cause because it did not connect the defendant to the residence. *See Streett,* 83 F.4th at 847. The district court agreed with the defendant that the search warrant lacked probable cause because it did not explicitly link the defendant to the residence where the evidence was found. *See id*. However, the district court concluded that the evidence would inevitably have been discovered even if the search warrant had been denied due to its deficiencies because the search warrant affidavit would inevitably have been corrected and the search warrant would have subsequently been issued. *See id*.

The Tenth Circuit affirmed the district court's determination that "the search warrant would inevitably have been issued under a properly revised affidavit had it originally (and properly) been denied for lack of probable cause." *Id*. at 848. To determine how likely it was that a proper warrant inevitably would have been granted, the circuit court considered four factors:

> (1) the extent to which the warrant process has been completed
> at the time those seeking the warrant learn of the search, (2) the
> strength of the showing of probable cause at the time the search
> occurred, (3) whether a warrant ultimately was obtained, albeit
> after the illegal entry, and (4) evidence that law enforcement
> agents jumped the gun because they lacked confidence in their
> showing of probable cause and wanted to force the issue by
> creating a fait accompli.

*Id*. at 850 (citing *Souza*, 223 F.3d at 1204) (internal quotation marks omitted).  The *Streett* court then determined that all four factors favored the application of the inevitable discovery doctrine in that case.  First, as to the extent to which the warrant process had been completed, the officer had actually obtained a warrant (albeit lacking probable cause); second, although the warrant itself lacked probable cause, the court found that there was sufficient probable cause based on the other facts available to the officer at the time the search was conducted; third, as to whether a warrant was ultimately obtained, the court found it likely that the officer would have obtained a subsequent proper warrant if his original request had been denied; and finally, as to the last factor, which considers whether the officer moved quickly because he lacked confidence that there was probable cause, the court found no evidence of such a scenario.  *See id*. at 850-51.

There are several problems with the Government's reliance on *Streett* in this case.  The most significant being that *Streett* did not involve a *Franks* violation.  Prior to *Streett*, the Tenth Circuit had approved the application of the inevitable discovery doctrine primarily in cases involving warrantless searches, where courts had determined that seized evidence would have nevertheless been subsequently discovered through lawful means, including a properly issued warrant.  *See*, *e.g*., *Christy*, 739 F.3d at 540; *Souza*, 223 F.3d at 1204; *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986).  In *Streett*, as discussed above, the Tenth Circuit expanded the doctrine to include a scenario where an officer obtains a warrant prior to a search which is later found to lack probable cause, but it is determined that a subsequent lawful warrant would have

likely been obtained because, among other things, the officer nevertheless had probable cause at the time the search was completed. *See Streett,* 83 F.4th at 848-49. But never has the Tenth Circuit or the Supreme Court applied the inevitable discovery rule to a case where a search warrant is obtained using knowingly or recklessly made false statements or material omissions. Nor does the Government cite to any case outside this circuit that would support the use of the doctrine in cases involving *Franks* violations. Given the complete lack of authority for such an application in this case, and the purpose behind the remedy of exclusion announced in *Franks*, the Court finds that the inevitable discovery doctrine does not apply here. *See Franks*, 438 U.S. at 168, 98 S. Ct. 2674 ("The requirement that a warrant not issue 'but upon probable cause, supported by Oath or affirmation,' would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile.").

Another issue with the Government's argument is that, even if a *Streett* analysis was proper here, the result would still lead to the conclusion that the inevitable discovery doctrine does not apply. The first and third factors under *Streett* would of course favor the Government, because this case doesn't involve a warrantless search as Agent Acee did obtain a search warrant prior to the search at issue - even if the search warrant contained a false statement and a material omission. The fourth factor would be neutral, again because a warrant was obtained and so no one could have "jumped the gun." But it is the second and most important *Streett* factor, "the strength of the showing of probable cause at the time the search occurred," which separates this case from the one in *Streett*. *Streett*, 83 F.4th at 850. The second factor is of particular significance because, as explained by the Tenth Circuit, "Without a showing by the Government that the officer had probable cause at the time the warrant application was submitted, the Government could not show

that an alternative properly obtained warrant inevitably would have been issued." *Id.* at 849. Here, the second factor weighs heavily in Defendant's favor because, absent the false statement and material omission included in the affidavit, there was no probable cause to believe that Defendant's DNA would be found on the firearm he allegedly possessed. As explained above, the only nexus between Norton and the firearm was the false statement that Romero saw Ms. Perez remove the firearm from under Norton's vest and place it in her black purse. The Government nevertheless argues that probable cause existed at the time of the search based on Deputy Vigil's lapel video and Chief Romero's testimony, a baffling position given that it is the lapel video which confirms that Romero did not actually see anything being removed from Defendant and which demonstrates how Romero's description of events would later be greatly embellished.

The Court finds that the Government has not met its burden of showing that the inevitable discovery doctrine applies in this case.

**D.   The Subsequent Search Warrant Obtained by Agent Acee Does Not Moot the Fourth Amendment Violation.**

The final position taken by the Government is that Defendant's motion to suppress is moot because Agent Acee obtained a subsequent warrant from a magistrate judge in a different federal district and secured another buccal swab of Defendant's DNA after Defendant had filed his motion to suppress. Doc. 108 at 19. The reason the Government can make this mootness argument is because, rather than filing a timely response to Defendant's motion to suppress, it sought and obtained an extension on the time to submit its response, during which time Agent Acee completed a new affidavit and obtained the second warrant. Doc. 104; Doc. 108-3. After obtaining the second warrant and after the Court set this matter for a *Franks* hearing, the United States filed its "Notice of Self-Suppression," stating that it did not intend to use the DNA sample from the original search

of Defendant but would only use the second sample secured by the second warrant.  Doc. 130.[12]

The Government concedes that once a *Franks* violation has been shown, "the search warrant must

be voided and the fruits of the search excluded to the same extent as if probable cause was lacking

on the face of the affidavit."  Doc. 136 at 12 (quoting *Franks*, 438 U.S. at 156, 98 S.C.t 2674,

2676).  However, argues the Government, the proper exclusion here is the fruits of the first,

challenged warrant, not the fruits of the second warrant obtained by Agent Acee.  *See id.*

Defendant disagrees and proposes that the second warrant does not alter the remedy of

exclusion in this case.   Citing to the Supreme Court's decision in *Davis v. Mississippi*, 394 U.S.

721, 89 S. Ct. 1394, 22 L.Ed.2d 676 (1969), Defendant points out that "[t]he exclusionary rule was

fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the

Fourth Amendment."  Doc. 116 at 9 (quoting *Davis*, 394 U.S. at 724, 89 S. Ct. 1394).  He argues

that where the government has obtained evidence in violation of the Fourth Amendment, that

evidence must be suppressed, and cannot then be introduced in some other iteration.  Here, notes

Defendant, the second warrant was obtained pursuant to an affidavit by the same agent, contained

the same information, and sought the same evidence.  This effort to "re-do" the warrant in light of

information revealed by the *Franks* motion, asserts Defendant, is "a blatant end-run around the

Fourth Amendment."  Doc. 135 at 9.

The Court determines that, even though not identified as such by the Government, the legal

theory it relies on for its argument that the DNA evidence obtained as a result of the second search

warrant should not be excluded here, is the independent source doctrine.  The independent source

---

[12] The Government does not cite to any case law, within the Tenth Circuit or otherwise, for its position that, in the midst of a suppression proceeding challenging the constitutionality of a warrant and search, the issue of suppression is "moot" once the Government agrees not to use the original unlawfully obtained evidence and instead proceeds with the same evidence subsequently obtained from a second warrant.  *See id.*

doctrine allows for the admission of evidence first observed or acquired unlawfully, but later acquired through an independent, lawful source. *See Murray v. United States*, 487 U.S. 533, 537-38, 108 S. Ct. 2529 (1988).  "In applying the doctrine in the Fourth Amendment context, the dispositive question is whether the source of probable cause claimed by the government is 'in fact a genuinely independent source of the information and tangible evidence at issue.'" *United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008) (quoting *Murray*, 487 U.S. at 542, 108 S. Ct. 2529); *see also United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995).  "A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'" *Id*. (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963)). A source is not independent if, "granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality." *Id*. (internal quotation and citation omitted).  The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence.  *See id*. at 1279 (citing *United States v. Lin Lyn Trading, Ltd*., 149 F.3d 1112, 1116 (10th Cir. 1998)).

The Court determines that the independent source doctrine does not apply to allow for the admission of the DNA evidence obtained from Norton as a result of the second search warrant. Although the Tenth Circuit has not set forth a specific test to determine the ultimate question whether a subsequent search pursuant to a lawful warrant was in fact a genuinely independent source of the information and evidence at issue, other courts have applied a two-factor test to answer the question.  The two factors include: (1) whether a neutral magistrate would have issued a warrant authorizing the search even if not presented with information that had been obtained during the unlawful search; and (2) whether the agent's decision to seek the warrant was not

38

prompted by the initial unlawful search.  *See United States v. Herrold*, 962 F.2d 1131, 1144 (3d

Cir. 1992); *Murray*, 487 U.S. at 542, 108 S. Ct. at 2535; *see also, e.g.,United States v. Jenkins*,

396 F.3d 751, 758 (6th Cir. 2005) ("If the application for a warrant contains probable cause apart

from the improper information, then the warrant is lawful and the independent source doctrine

applies, providing that the officers were not prompted to obtain the warrant by what they observed

during the initial entry") (internal quotation and citations omitted); *United States v. Markling*, 7

F.3d 1309, 1315-16 (7th Cir. 1993) ("The first question is whether the illegally obtained evidence

affected the magistrate's decision to issue the search warrant. . . [the] second question is whether

[the agent's] decision to seek the warrant was prompted by what he had seen during his illegal

search of the briefcase. In other words, would [the agent] have applied for the warrant if he had

not illegally searched the briefcase?").

Here, the Government may meet the first prong of the test because a neutral magistrate

(albeit a different magistrate in a different district) issued the second warrant and the affidavit in

support of that warrant did not mention the DNA results from the search authorized by the initial

warrant.[13]  The Government's position, however, fails at the second prong because the decision to

---

[13] However, it could be argued that the first prong has not been met because the second warrant, like the first, contained false statements and/or omissions which, once excluded or included, would vitiate probable cause. This is so because the magistrate judge who issued the second warrant was also provided the same statement that "Chief Romero observed Perez remove an object from the small of Norton's back and place it into her black purse."  Doc. 108-3, ¶6.  Nowhere in the second affidavit in support of the second search warrant is the magistrate judge informed that this statement was false, or even that the statement was alleged to be false in a pending motion to suppress alleging a *Franks* violation.  *See id*.  The affidavit also does not mention that Chief Romero initially confirmed that he did not see anything removed from or placed into Norton's waistband, or that Romero and his wife's view was blocked and they could not see what Ms. Perez was doing, even though by the time the second affidavit was submitted Agent Acee had reviewed the lapel video confirming these facts.  *See id.*  The second affidavit also includes other statements meant to support probable cause, including "Ms. Martinez said [to Deputy Vigil] the woman [Ms. Perez] either removed something from under Norton's vest or placed something under the vest."  Doc. 108-3 at ¶7(b).  Reviewing the lapel video, the Court notes that this is not an accurate

seek a second warrant was made only after: 1) Defendant filed his motion to suppress and the Government and Agent Acee realized that the information provided to the FBI by Romero was "different" than what Romero had stated during his state court testimony, and 2) the FBI had already confirmed that the DNA sample taken from Norton matched at least some of the DNA found on the firearm at issue. Doc. 135-1 at 52-54. Given the potential constitutional infirmity of the first warrant, the decision was made to seek a second warrant for the same evidence before the Court could rule on the constitutional challenge to the first warrant. At that time, the Government and Agent Acee undoubtedly knew that the buccal swab they sought would produce the same result as the first buccal swab, given the permanent nature of DNA, and that they would again find evidence that Norton's DNA matched that found on the firearm.[14] Thus, the second warrant for Defendant's DNA was inextricably linked to the first warrant in that the second warrant would not have been sought but for the inadmissible evidence produced by the first. Under these circumstances, the Court finds the government has not met its burden of showing there is truly an independent source for the challenged evidence. *See Forbes*, 528 F.3d at 1278, 1279. Because there is a causal nexus between the constitutional violation at issue here and the second sample of

---

statement. Ms. Martinez actually stated, "I *don't know* if she [Ms. Perez] took something or put something in, cause I couldn't see nothing cause there was a little flower thing there…" Doc. 97, Ex. A at 3:40 (emphasis added). The Court, however, has not been asked and does not believe it is necessary, at this point, to determine whether the second warrant affidavit also contained a *Franks* violation in that it included false statements or omissions which were knowingly or recklessly and were material to the second magistrate judge's finding of probable cause.

[14] It is highly unlikely that, if the evidence was of a different non-permanent nature and there was no additional information, the Government and Agent Acee would have sought a second warrant for a search of the same place after the first warrant was challenged on constitutional grounds. For example, if this case involved the discovery of a bag of drugs at Norton's residence, it would make no sense to request a second warrant a year later, absent new information, seeking the same bag of drugs found during the first search, because there would be no assurance or reason to believe that the bag of drugs would still be there. Here, however, there is no question that Agent Acee and the Government were aware that Norton's DNA, which is permanent and immutable, would always be available and could be obtained from him at any time.

Norton's DNA, the Court disagrees with the Government that the DNA evidence it now intends to introduce against Defendant is not subject to exclusion under *Franks* as the fruit of an unlawful search. *See Franks*, 438 U.S. at 155-56, 98 S. Ct. 2674; *Wong Sun,* 371 U.S. at 484, 83 S. Ct. 407. That evidence must and will be excluded.

## IV.
## CONCLUSION

For all the reasons set forth above, the Court **GRANTS** the *Opposed Motion to Suppress Evidence by Shawn Michael Norton*, Doc. 97.

**IT IS SO ORDERED.**

_____
HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE